**LUNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 1st STREET FOUNDATION, INC. d/b/a FIRST STREET FOUNDATION, <br><br>                Plaintiff, <br><br>     -against- <br><br> SSBN LTD, d/b/a FATHOM and CLIMATE CHECK, INC., <br><br>                Defendants. | Case No. _21cv1374_ |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF FIRST STREET FOUNDATION'S APPLICATION, BY ORDER TO SHOW CAUSE, FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

MORRISON & FOERSTER LLP
Jamie A. Levitt
Adam J. Hunt
Janie C. Buckley
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: jlevitt@mofo.com
       adamhunt@mofo.com
       jbuckley@mofo.com

*Attorneys for Plaintiff First Street Foundation*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ............................................................................... 2

      A.    First Street Develops Cutting-Edge Flood Models for the Public Interest. ........... 2

      B.    First Street and Fathom Agree to Develop Certain Models and Hazard Layers, with All Output Data owned by First Street. ........................................... 4

      C.    Fathom Agreed to Keep First Street's Proprietary Future Inland Flood Data Confidential and Was Prohibited From Licensing That Data to Any First Street Competitors. ...................................................................................... 5

      D.    Fathom Admittedly Breached the Agreement by Disclosing the Future Inland Flood Data to First Street's Competitor ...................................................... 6

      E.    ClimateCheck Has Used, and Continues to Use, First Street's Data to Compete with First Street. ................................................................................... 8

      F.    First Street Has Suffered, and Continues to Suffer, Irreparable Competitive Harm From Fathom's Improper Disclosure of First Street's Data and ClimateCheck's Ongoing Use of First Street's Trade Secrets. .............. 9

LEGAL STANDARD ....................................................................................... 10

JURISDICTION .............................................................................................. 10

      A.    The Court has Subject Matter Jurisdiction Over This Dispute. .......................... 10

      B.    This Court has Personal Jurisdiction Over Fathom and ClimateCheck............... 11

ARGUMENT ................................................................................................... 14

I.    FIRST STREET WILL SUFFER IRREPARABLE HARM IF FATHOM CONTINUES TO PROVIDE FIRST STREET'S FUTURE INLAND FLOOD DATA TO CLIMATECHECK. ................................................................................ 14

      A.    The Future Inland Flood Data is First Street's Trade Secret. ............................. 15

      B.    Fathom's Unauthorized Disclosure of First Street's Trade Secrets and ClimateCheck's Use of Those Trade Secrets Constitutes Irreparable Harm. ....... 18

      C.    First Street Will Suffer Ongoing Irreparable Harm if Fathom Continues to Disclose First Street's Trade Secrets. ................................................................ 19

      D.    First Street Will Suffer Ongoing Irreparable Harm if ClimateCheck Continues to Use First Street's Trade Secrets to Compete. ................................. 20

II.    FIRST STREET IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS. ....................................................................................................... 21

      A.    Fathom Admittedly Disclosed First Street's Proprietary, Confidential Future Inland Flood Data in Violation of the Agreement................................... 21

B.      There Can Be No Dispute That Climate Check Misappropriated First Street's Trade Secrets—the Future Inland Flood Data. ...................................... 22

III.      THE REQUESTED INJUNCTION IS IN THE PUBLIC INTEREST AND THE BALANCE OF THE EQUITIES TIP IN FAVOR OF FIRST STREET. ....................... 24

IV.      BOND IS UNNECESSARY BECAUSE THE LIKELIHOOD OF SUCCESS ON THE MERITS IS OVERWHELMING. ........................................................................ 24

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anacomp, Inc. v. Shell Knob Servs.*,
No. 93 Civ. 4003 (PKL), 1994 U.S. Dist. LEXIS 223
(S.D.N.Y. Jan. 7, 1994) ....................................................................................18, 21, 22

*Ayco Co., L.P. v. Frisch*,
795 F. Supp. 2d 193 (N.D.N.Y. 2011) ...................................................................22

*DeWitt Stern Group, Inc. v. Eisenberg*,
No. 13 Civ. 3060, 2013 U.S. Dist. LEXIS 78598
(S.D.N.Y. June 3, 2013) ......................................................................................25 n.2

*Fabkom, Inc. v. R.W. Smith & Assocs.*,
No. 9 Civ. 4552 (MBM), 1996 U.S. Dist. LEXIS 13686
(S.D.N.Y. Sept. 18, 1996) ................................................................................ *passim*

*FMC Corp. v. Taiwan Giant Indus. Co.*,
730 F.2d 61 (2d Cir. 1984) ................................................................................18, 22

*Foot Locker Retail Inc. v. SBH, Inc.*,
No. 03 Civ. 5050 (DAB) 2005 U.S. Dist. LEXIS 599
(S.D.N.Y. Jan. 18, 2005) ....................................................................................11, 14

*IDG USA, LLC v. Schupp*,
416 F. App'x 86 (2d Cir. 2011) ..........................................................................19, 20

*Ingenito v. Riri USA, Inc.*,
89 F. Supp. 3d 462 (E.D.N.Y. 2015.) .................................................................12, 13

*Kraus USA, Inc. v. Magarik*,
No. 17-CV-6541 (ER), 2020 U.S. Dist. LEXIS 83481
(S.D.N.Y. May 12, 2020) .........................................................................................23

*Lighting & Supplies, Inc. v. Sunlite USA Corp.*,
14-CV-4344, 2015 U.S. Dist. LEXIS 78571
(E.D.N.Y. June 16, 2015) ....................................................................................24, 25

*Paz Sys. v. Dakota Grp. Corp.*,
514 F. Supp. 2d 402 (E.D.N.Y. 2007) ......................................................................25

*Richardson Greenshields Sec., Inc. v. Mui-Hin Lau*,
651 F. Supp. 929 (S.D.N.Y. 1986) ............................................................................22

*Secured Worldwide LLC v. Kinney*,
No. 15 Civ. 1761 (CM), 2015 U.S. Dist. LEXIS 44730
(S.D.N.Y. April 1, 2015) ...................................................................................16, 19, 20

*Shamrock Power, LLC v. Scherer*,
No. 12 Civ. 8959 (KMK)(JCM), 2016 U.S. Dist. LEXIS 170901
(S.D.N.Y. Dec. 7, 2016) ......................................................................................................25

*Sybron Corp. v. Wetzel*,
46 N.Y. 2d 197 (1978) ................................................................................................13, 14

*Testing Servs., N.A. v. Pennisi*,
443 F. Supp. 3d 303 (E.D.N.Y. 2020) .............................................................10, 20, 23, 24

*Tycoons Worldwide Grp. (Thai.) Pub. Co., Ltd. v. JBL Supply Inc.*,
721 F. Supp. 2d 194 (S.D.N.Y. 2010) .................................................................................22

*Uni-Systems, LLC v. U.S. Tennis Ass'n, Inc.*,
350 F. Supp. 3d 143 (E.D.N.Y. 2018) .................................................................................16

**Statutes**

18 U.S.C. § 1839(3) ....................................................................................................................15

**Other Authorities**

CPLR § 302(a)(1) .......................................................................................................................11

CPLR § 302(a)(3) .................................................................................................................11, 12

Fed. R. Civ. P. 65(c) ..................................................................................................................25

Plaintiff 1st Street Foundation, Inc. ("First Street") hereby submits this Memorandum of Law in support of its Application, by Order to Show Cause, seeking a temporary restraining order ("TRO") and preliminary injunction, *inter alia*, (i) enjoining Defendant SSBN LTD d/b/a Fathom ("Fathom") from continuing to provide any of First Street's confidential, proprietary flood data to Defendant ClimateCheck, Inc. ("ClimateCheck"); and (ii) barring ClimateCheck from using First Street's proprietary flood data in any manner whatsoever.

## PRELIMINARY STATEMENT

First Street has been forced to file this action seeking immediate and permanent injunctive relief because its business partner, Fathom, admittedly breached a July 26, 2019 Services and Data Rights Agreement (the "Agreement") between First Street and Fathom by purporting to license First Street's proprietary, confidential inland flood data (as defined further below, First Street's "Future Inland Flood Data") to First Street's direct competitor, ClimateCheck.

Although Fathom has freely admitted its breach, it has refused to immediately cease providing First Street's Future Inland Flood Data to ClimateCheck. And ClimateCheck has refused to stop using First Street's Future Inland Flood Data in software products that ClimateCheck has already sold to potential First Street customers and continues to market to potential customers. When First Street demanded that Fathom immediately cease and desist from supplying any more of First Street's confidential Future Inland Flood Data to ClimateCheck, Fathom originally promised to cancel the license. But, incredibly, after First Street pressed Fathom for an update, Fathom declared that rather than cancel the license, Fathom actually entered into *another* "license" with ClimateCheck that would give ClimateCheck continued access to First Street's proprietary data for an additional four months. During this

time Fathom admitted that ClimateCheck will continue to use First Street's Future Inland Flood Data in software products that has already sold and is currently marketing to First Street's potential customers. Based on Fathom's admitted breach of the Agreement and ClimateCheck's improper use of First Street's trade secrets to lure potential customers from First Street, there can be no question that First Street is likely to succeed on the merits of a breach of contract claim against Fathom and claims for misappropriation of trade secrets against ClimateCheck.

Nor can there be any dispute that Fathom's breach has already caused, and will continue to cause, irreparable harm to First Street. Courts have repeatedly held that the unauthorized disclosure and use of trade secrets, such as the Future Inland Flood Data, is alone sufficient to find irreparable harm. Here, the risk of ongoing harm to First Street is even more acute because ClimateCheck has already acquired customers and solicited potential customers by passing off First Street's proprietary Future Inland Flood Data as part of ClimateCheck's own product. Giving ClimateCheck an additional four months of access, through Fathom, to First Street's intellectual property will only compound the damage unless this Court provides immediate relief. First Street therefore respectfully submits that the Court should grant First Street's application for a temporary restraining order and preliminary injunction in order to safeguard First Street's intellectual property and prevent further injury to its competitive position.

## FACTUAL BACKGROUND

### A. First Street Develops Cutting-Edge Flood Models for the Public Interest.

First Street is a non-profit research and technology company that works to develop comprehensive flood risk modeling for property in the United States. (Declaration of Matthew Eby (hereinafter "Eby Decl." ¶ 3.)) First Street has used its proprietary and cutting-edge modeling techniques to estimate present and future flood risk for every home and property in the contiguous United States. (*Id.* ¶ 4.) First Street provides high-level versions of these

2

parcel-specific calculations to the public free of charge on its website FloodFactor.com.  (*Id.*)

First Street's flood models also generate geospatial data, known as Hazard Layers, which allow First Street to generate and provide a visual representation of the estimated flood risk on a map.  (*Id.* ¶ 5.)  Hazard Layers are complex calculations that represent the depth of a potential flood in a given location based on the conditions defined in a given model and the probability of a flooding event.  (*Id.*)  Each First Street model can be used to produce sets of Hazard Layers, which are based on different probabilities of flooding.  For example, one Hazard Layer could assume a scenario where there is flooding every other year (a 50% probability) to flooding that occurs once in 500 years (a .02% probability).  Below is an example of how a Hazard Layer for a 5% flooding possibility appears on the FloodFactor® website:



First Street licenses its flood models and Hazard Layers by granting its licensees access to an Application Programming Interface ("API") that First Street has developed.  The API allows third party licensees to seamlessly access First Street's proprietary flood risk models and Hazard Layers for commercial and non-commercial purposes, including research, internal and

external analysis, and public display purposes. (*Id.* ¶¶ 6-7.) First Street licenses its API to businesses for commercial, for-profit uses through its wholly-owned for-profit subsidiary Risk Factor. (*Id.* ¶ 7.) Licensing First Street's models and Hazard Layers for commercial use is a critical source of funding for First Street's non-profit mission. (*Id.*) First Street's for-profit partners include Redfin, a real estate brokerage. Under the First Street-Redfin agreement, Redfin is able to generate a display a FloodFactor™ score and Hazard Layers when a Redfin user searches for a particular piece of property. (*Id.*)

**B.** **First Street and Fathom Agree to Develop Certain Models and Hazard Layers, with All Output Data owned by First Street.**

On July 26, 2019, First Street entered into a Services and Data Rights Agreement (the "Agreement") to further perfect First Street's modeling and develop new flood risk models and Hazard Layers. (Eby Decl. ¶¶ 10-11.) Any services provided by Fathom to First Street were subject to the terms of the Agreement and would be governed by certain Statements of Work entered into by both parties. The first Statement of Work ("Statement of Work No. 1" or "SOW1") was entered into on July 26, 2019. (*Id.* ¶ 12.) Statement of Work No. 1 describes five models, called Deliverables, that Fathom was required to develop and also specifies the ownership of the various models, as well as the Hazard Layers generated by those models. (*Id.* ¶ 13.) The Hazard Layers are called Output Data in the Agreement and include the Future Inland Flood Data at issue here (defined below). (*Id.*) The parties agreed that First Street would own all right, title, and interest in any Output Data developed pursuant to the Agreement and all intellectual property rights therein. (Eby Decl. ¶¶ 14-16.)

One of the Deliverables Fathom agreed to develop is an improved version of its previously existing inland flood model that includes certain additional flood data, as specified by First Street. (*Id.* ¶ 14.) Although Fathom developed the "Improved Future Inland Model," First

Street owns the resulting "Improved Future Inland Flood Model Hazard Layers" (the "Future Inland Flood Data"). The Future Inland Flood Data is a subset of the Output Data, or Hazard Layers, developed pursuant to the Agreement and owned by First Street. The Future Inland Flood Data is the focus of this dispute. (*Id.*)

### C. Fathom Agreed to Keep First Street's Proprietary Future Inland Flood Data Confidential and Was Prohibited From Licensing That Data to Any First Street Competitors.

Both the Agreement and Statement of Work No. 1 include confidentiality provisions governing the Deliverables and Output Data, including the Future Inland Flood Data, developed by the parties. Section 4.3 of the Agreement provides that Fathom

"will use all reasonable and due care (and in any event no less care than is used to protect its own confidential information of like importance) to safeguard [First Street's] Confidential Information. Except as otherwise specifically stated in this Agreement, [Fathom] will not, either directly or indirectly, (a) divulge, disclose or communicate such Confidential Information to any third party or (b) use, in whole or in part, [First Street's] Confidential Information any purpose other than to perform its obligations under this Agreement."

(Eby Decl. ¶ 15.)

Under the Agreement, First Street's Confidential Data is specifically defined to include any Output Data created pursuant to the Agreement and any Statements of Work, such as the Future Inland Flood Data. (*Id*. ¶ 16.)

Pursuant to Statement of Work No. 1, Fathom was granted certain resale rights for the Future Inland Flood Data, but Fathom specifically agreed that it would "not sell any Hazard Layers [including the Future Inland Flood Data] to any First Street Competitor." (Eby Decl. ¶ 17) (citing SOW1 § C.9.) Under the Agreement, a First Street Competitor is defined as "any third party who (i) uses flood data (or similar data) to build consumer facing applications, products or services, or (ii) provides flood data (or similar data) to third parties who build consumer facing applications, products or services." (Eby Decl. ¶ 18) (citing Agreement § 11.2.)

**D.     Fathom Admittedly Breached the Agreement by Disclosing the Future Inland Flood Data to First Street's Competitor**

First Street first learned of a potential breach of the Agreement in mid-January 2021 when First Street obtained a copy of a PowerPoint presentation that ClimateCheck was using to market its products.  (Eby Decl. ¶ 20.)  ClimateCheck creates software products designed to quantify risks related to climate change and sells a "risk assessment and report" to consumers across the United States for a one-time fee of $499. (Compl. ¶ 11.)  Accordingly, ClimateCheck directly competes with First Street in developing and selling climate change-related risk models and associated data, but ClimateCheck has not developed any of its own flood risk datasets or flood modeling.  Instead, ClimateCheck relies primarily on publicly available flooding data from the National Oceanic and Atmospheric Administration ("NOAA").  Based on the content of the presentation, First Street was concerned that ClimateCheck may have been provided with or had access to First Street's proprietary Hazard Layers and contacted Fathom for more information. (*Id.*¶ 20.)

After being confronted by First Street, Fathom acknowledged that it licensed First Street's proprietary Future Inland Flood Data to ClimateCheck for $1,600, even though such a license is not permitted by the Agreement and the commercial value of that data is hundreds of thousands of dollars.  (*Id.* ¶¶ 23, 25.)  Accordingly, First Street put Fathom on explicit notice that Fathom had breached the parties' Agreement.  No one at Fathom has ever disputed this breach. (*Id.* ¶¶ 23-26.)  Instead, Fathom informed First Street on or around January 22, 2021, that it was cancelling the offending license with ClimateCheck.

Further, Fathom ***admitted*** its breach in writing.  On February 22, 2021, Fathom sent First Street a document stating that "[it] agreed in the Agreement not to sell, license, supply, distribute or otherwise make available certain models to any 'First Street Competitor' (defined as 'any

third party who (i) uses flood data (or similar data) to build consumer facing applications, products or services, or (ii) provides flood data (or similar data) to third parties who build consumer facing applications, products or services')" and that Fathom "***inadvertently licensed a small amount of data to a potential First Street Competitor*** and, as soon as this was picked up, put in place steps to terminate that license arrangement." (*Id.* ¶ 28.) Fathom later admitted to First Street that it granted the license to ClimateCheck in September 2020. (Eby Decl. ¶ 32.)

In early March, First Street pressed Fathom for an update when First Street saw that ClimateCheck represented on its website that it was providing "a flood risk rating based on the expected probability and depth of a flood between 2020 and 2050 according to Fathom's modeling." Based on First Street's review of the output from ClimateCheck's website, First Street believed ClimateCheck was still using First Street's proprietary Future Inland Flood Data to generate flood risk ratings. In fact, ClimateCheck's website admitted that it uses Fathom's modeling to provide a flood risk rating, as shown below:

> **Surface Water and Riverine Flooding**
> These types of flooding can occur away from the coast. Fluvial, or riverine, flooding happens when a river, lake, or stream overflows onto the surrounding land. Pluvial flooding includes flash floods and surface water, and occurs when extreme rainfall creates a flood away from a body of water. We use the Fathom US flood hazard dataset to quantify the present and future risks of these types of floods. The Fathom analysis establishes current (2020) flood risk using historical meteorological observations and CMIP5 climate models to feed models of rainfall and runoff that capture flooding behavior across the United States. Flood risk in 2050 is modeled using the same climate model ensemble under the RCP 4.5 scenario. We provide a flood risk rating based on the expected probability and depth of a flood between 2020 and 2050 according to Fathom's modeling.

(From https://climatecheck.com/our-methodologies/; accessed March 9, 2021)[1]

Given this continued use of First Street's data by ClimateCheck, First Street again pressed Fathom about the breach and the steps it understood Fathom was taking to address it. What First Street learned in March, however, was that Fathom had licensed First Street's data to

---

[1] As of March 15, 2021, ClimateCheck appears to have removed its admission that it uses Fathom's modeling to provide a flood risk rating in order to try and hide its continued wrongful use of First Street's trade secrets.

ClimateCheck months earlier in September 2020 and, rather than immediately cancelling the license as Fathom had represented it would do in January, Fathom compounded the breach. Fathom informed First Street that it would take approximately four months for ClimateCheck to "swap out" First Street's Future Inland Flood Data from the products that ClimateCheck had sold to at least two existing customers. Although Fathom claimed that it would attempt to accelerate the time by which ClimateCheck had completed the data "swap," Fathom did not agree or offer to take steps to immediately cause ClimateCheck to cease using First Street's Future Inland Flood Data or any other First Street Trade Secret Information. Instead, Fathom knowingly breached the Agreement again by entering into a *new* agreement with ClimateCheck for a four-month "wind down" period pursuant to which ClimateCheck would receive a purported "license" to continue using First Street's confidential and proprietary data.

E. **ClimateCheck Has Used, and Continues to Use, First Street's Data to Compete with First Street.**

In early March, Fathom admitted to First Street that its improper license of First Street's data to ClimateCheck took place in September 2020. Given the limited number of potential customers in the market for climate modeling products, there is no doubt that over these six months ClimateCheck used—and is currently using—First Street's proprietary Future Inland Flood Data and model to secure a contract with two of the biggest potential customers for climate change related risk modeling, Zillow and Redfin. ClimateCheck markets its ability to provide a "complete" product that addressing many different environmental risks (e.g., wildfire). Flooding is a key risk, yet ClimateCheck is relying on First Street's confidential Future Inland Flood Data—which it obtained for far less than market value through Fathom's breach of the Agreement—to market itself as having a flood risk model.

ClimateCheck already entered into, at a minimum, two contracts with customers on the basis of First Street's Inland Flood Data. (Eby Decl. ¶ 35.) And ClimateCheck insists that it has the right to continue using First Street's Future Inland Flood Data in the products that it sold to those customers, despite being put on notice that Fathom was not authorized to license that data. Specifically, after learning that Fathom breached the Agreement a second time and purportedly gave ClimateCheck a license to use the Future Inland Flood Data for a four-month "wind down" period, First Street put ClimateCheck directly on notice that it was, and is, improperly using First Street's proprietary trade secrets. (*Id.* ¶ 36.) But ClimateCheck dug in its heels and insisted that it has the right to continue to use the Future Flood Inland Data because it has entered into a license agreement for that data with Fathom. (*Id.*) ClimateCheck has also claimed that the only reason it has consented to stop using First Street's trade secrets at all is because it is doing a "favor" to Fathom, who made a "mistake" by granting it a license. (*Id.* ¶ 40)

**F. First Street Has Suffered, and Continues to Suffer, Irreparable Competitive Harm From Fathom's Improper Disclosure of First Street's Data and ClimateCheck's Ongoing Use of First Street's Trade Secrets.**

Fathom's wrongful disclosure of First Street's proprietary and confidential information, in breach of the parties' agreement, has caused, and continues to cause, serious competitive harm to First Street. (Eby Decl. ¶ 41.) Fathom improperly granted ClimateCheck—a direct competitor to First Street—a license to use First Street's confidential and proprietary data and has not taken any steps to cause ClimateCheck to stop using First Street's data immediately, and Fathom instead has acquiesced to ClimateCheck's continued use of First Street's confidential and proprietary data. (*Id.* ¶ 42.)

The use of First Street's confidential and proprietary data by ClimateCheck, a direct competitor, causes serious competitive harm to First Street. ClimateCheck has not expended the resources to develop its own flood risk models or hazard layers. Thus, its ability to offer flood

risk modeling to customers, including First Street's potential customers, is based on Fathom having breached the Agreement and given First Street's proprietary data to ClimateCheck. (*Id.* ¶ 43.) Not only has ClimateCheck already entered into contracts with at least two customers on the basis of First Street's Future Inland Flood Data, ClimateCheck's continued use of First Street's data threatens First Street's ability to enter into deals of its own by weakening First Street's position as a market leader and innovator. Indeed, both First Street and ClimateCheck are actively seeking business from Zillow and Redfin. (*Id.* ¶ 44.) And, ClimateCheck is improperly using First Street's proprietary flood models to win that business away from First Street. Further, the value of First Street's confidential data depends in part on the fact that it is only available for use and exploitation by First Street and only First Street may authorize its use by others. ClimateCheck's continued use and exploitation of that data, including its purported licensing to ClimateCheck's deal partners, dilutes and undercuts the data's value. (*Id.* ¶ 44.)

## LEGAL STANDARD

To obtain a temporary restraining order and a preliminary injunction the plaintiff must show "(1) either (a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, and (2) a likelihood of irreparable harm if the requested relief is denied." *Testing Servs., N.A. v. Pennisi,* 443 F. Supp. 3d 303, 327 (E.D.N.Y. 2020) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 152-53 (2d Cir. 2007). "In addition, the movant must show that 'a preliminary injunction is in the public interest[,] and 'that the balance of equities tips in his favor'" *Id.* at 327-28 (citations omitted).

## JURISDICTION

### A.     The Court has Subject Matter Jurisdiction Over This Dispute.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because First Street is asserting

a claim against ClimateCheck for a violation of the Defend Trade Secrets Act, 28 U.S.C. § 1836 (the "DTSA"). The Court has supplemental jurisdiction over First Street's breach of contract claim against Fathom pursuant to 28 U.S.C. § 1367 because, as set forth herein, that claim is inextricably related to First Street's claim against ClimateCheck under the DTSA. Further, this Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between the parties and the amount in controversy exceeds $75,000. First Street is organized under the laws of the District of Columbia and has its principal place of business in Brooklyn, New York. Fathom is a company organized under the laws of the United Kingdom, with its principal place of business in Bristol, England, and defendant ClimateCheck is a Florida corporation with its principal place of business in California. And the commercial value of the Future Inland Flood Data exceeds $75,000.

**B.      This Court has Personal Jurisdiction Over Fathom and ClimateCheck.**

This Court has personal jurisdiction over ClimateCheck and Fathom under New York's long-arm statute because both entities regularly transact and/or solicit business in New York and expect, or reasonably expect, to be sued in New York. *See* CPLR § 302(a).

"To determine whether personal jurisdiction is proper over a nonresident defendant in a diversity case, the court must look first to the long-arm statute of the forum state. If the exercise of jurisdiction is appropriate under that statute, the court then must decide whether such exercise comports with the requisites of due process." *Foot Locker Retail Inc. v. SBH, Inc.*, No. 03 Civ. 5050 (DAB) 2005 U.S. Dist. LEXIS 599, at *7-*8 (S.D.N.Y. Jan. 18, 2005) (internal quotations omitted). Section 302(a)(1) of New York's long-arm statute permits the exercise of personal jurisdiction over a non-domiciliary when it "transacts any business within the state or contracts anywhere to supply goods or services in the state." *See* CPLR § 302(a)(1). Section 302(a)(3) further permits the exercise of personal jurisdiction over a non-domiciliary when it commits a

tortious act outside of New York, but causes injury within New York, provided that the

non-domiciliary "(i) regularly does or solicits business, or engages in any other persistent course

of conduct, or derives substantial revenue from goods used or consumed or services rendered, in

the state, or (ii) expects or should reasonably expect the act to have consequences in the state and

derives substantial revenue from interstate or international commerce."  *See* CPLR § 302(a)(3).

These elements are met here.

    **Fathom.**  This Court has personal jurisdiction over Fathom under Section 302(a)(1)

because (1) Fathom "transact[ed] business within the state" through its contract with First Street

to provide services to First Street within New York and (2) First Street's breach of contract claim

against Fathom "arises out of" the parties business dealings in New York.  *See Ingenito v. Riri*

*USA, Inc.*, 89 F. Supp. 3d 462, 476 (E.D.N.Y. 2015).

    Jurisdiction over Fathom is also proper under Section 302(a)(3) because Fathom's breach

of the Agreement has caused First Street direct and irreparable harm in New York.  (Eby Decl.

¶¶ 19, 41-44.)  Furthermore, Fathom regularly does or solicits business in New York, including

through its ongoing contractual relationship with First Street and business dealings with other

New York companies.  Fathom should reasonably expect its breach of the Agreement to have

consequences in New York, given that First Street is located in New York, and the trade secrets

and intellectual property developed under the Agreement, including the Future Inland Flood

Data, was developed in Brooklyn, New York.  (*Id.*)  Moreover, Fathom expects or reasonably

should expect to be sued in New York in an action seeking injunctive relief because it agreed

that the Agreement is to be governed by New York law, that New York would serve as the

arbitral forum in any claim for damages that may arise out of or relating to a breach of the

Agreement, and that "any court having competent jurisdiction" could hear a claim for injunctive

relief arising out of the Agreement. (Compl. ¶ 6.)

Due process is satisfied because Fathom also has "certain minimum contacts [with New York] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice," *Ingenito*, 89 F. Supp. 3d at 478. Fathom has contracted with First Street, a New York-based organization, and First Street's claim "arises out of or relates" to these contacts with New York. *Id.* Thus, Fathom purposefully availed itself of doing business in New York and could reasonably foresee being haled into court in New York. *Id.* at 478-79.

**ClimateCheck.** This Court has personal jurisdiction over ClimateCheck for two reasons.

First, ClimateCheck's actions have caused, and continue to cause, harm to First Street in Brooklyn, New York, where First Street has its principal place of business. ClimateCheck's continued use of First Street's confidential, proprietary Future Inland Flood Data threatens the loss of New York-based customers, including, but not limited to, New York customers who may turn to ClimateCheck's website for flood risk estimates rather than First Street's, as well as the loss of potential business partners in New York who may enter into contracts with ClimateCheck based on its improper use of First Street's Future Inland Flood Data. This is sufficient to show a New York-based injury under Section 302(a)(3). *See Sybron Corp. v. Wetzel*, 46 N.Y. 2d 197 (1978) (holding that the injury requirement of Section 302(a)(3) was satisfied when the resident corporation alleged that it sought to avert the loss of New York customers to a non-domiciliary corporation who allegedly stole the resident corporation's trade secrets).

Second, ClimateCheck regularly does or solicits business in New York by offering its "climate change risk snapshot services," including its flood risk rating that wrongfully incorporate First Street's confidential and proprietary data, to New York residents and property owners, via its website, climatecheck.com. Further, ClimateCheck should reasonably expect for

its continued misappropriation of First Street's trade secret data to have consequences in New York and for First Street to feel the injury from ClimateCheck's misappropriation of First Street's Future Inland Flood Data in New York because ClimateCheck is offering its services to New York-based customers. *See Sybron* 46 N.Y. at 205 (finding that the injury requirement of the New York long-arm statute was satisfied when the use of plaintiff's trade secrets threatened the loss of New York customers); *see also Foot Locker*, 2005 U.S. Dist. LEXIS 599 at *13-*14 (foreseeability requirement of the New York long-arm statute met when defendant tried to sell the allegedly infringing product to a New York consumer and defendant competed with plaintiff's business in New York). Additionally, ClimateCheck is not engaged in a purely local business. Rather, it offers its risk-rating services, including its flood risk rating services, to customers throughout the United States.

Due process requirements are also satisfied because ClimateCheck has sufficient minimum contacts with New York. Among other things, ClimateCheck has purposefully availed itself of doing business in New York by offering its "climate change risk snapshot services," including its flood risk rating that wrongfully incorporates First Street's confidential and proprietary data, to New York residents and property owners. Further, this suit arises from ClimateCheck's misappropriation of First Street's trade secrets to wrongfully compete with First Street in New York and offer its flood risk rating to New York consumers.

## ARGUMENT

## I. FIRST STREET WILL SUFFER IRREPARABLE HARM IF FATHOM CONTINUES TO PROVIDE FIRST STREET'S FUTURE INLAND FLOOD DATA TO CLIMATECHECK.

There can be no dispute that First Street owns the intellectual property for the Future Inland Flood Data under the Agreement and that the Agreement prohibited Fathom from licensing the Future Inland Flood Data to any First Street Competitor, such as ClimateCheck.

Despite admitting that it breached the Agreement by disclosing the Future Inland Flood Data to ClimateCheck, and that its continued disclosure is an ongoing breach, Fathom has refused to cease licensing the Future Inland Flood Data to ClimateCheck or to take steps to ensure that ClimateCheck immediately stops using First Street's Future Inland Flood Data. Instead, Fathom compounded its breach by recently entering into a *new* license agreement with ClimateCheck that purportedly gives ClimateCheck continued access to First Street's Future Inland Flood Data for at least another four months.

And despite acknowledging that Fathom's license was a "mistake" and being on notice of the breach, ClimateCheck is continuing to use First Street's Inland Flood Data in software products that it has already sold to customers and is marketing to potential business partners that are also in discussions with First Street to license the same data. Indeed, unlike First Street, ClimateCheck has not spent the time or resources to develop any proprietary flood data such as the Future Inland Flood Data and is improperly profiting from First Street's trade secrets. Accordingly, First Street will suffer continuing irreparable harm in the absence of injunctive relief enjoining Fathom from continuing to provide ClimateCheck access to and support for First Street Future Inland Flood Data and barring ClimateCheck from using that data.

### A.    The Future Inland Flood Data is First Street's Trade Secret.

The Future Inland Flood Data at issue here qualifies as a trade secret under New York law and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 because First Street took every effort to safeguard this highly technical data, which it developed at a significant cost in order to have a competitive advantage in the market for flood risk modeling.

"A trade secret may consist of any formula, pattern, or device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Fabkom, Inc. v. R.W. Smith & Assocs.*,

No. 9 Civ. 4552 (MBM), 1996 U.S. Dist. LEXIS 13686, at *16-*17 (S.D.N.Y. Sept. 18, 1996) (*quoting* Restatement of Torts § 757, cmt. b (1939)).  To determine whether information constitutes a trade secret, courts in New York consider the following factors: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Secured Worldwide LLC v. Kinney*, No. 15 Civ. 1761 (CM), 2015 U.S. Dist. LEXIS 44730, at * 35-36 (S.D.N.Y. April 1, 2015) (internal quotations omitted).  "These factors are also instructive in analyzing a claim under the DTSA." *Uni-Systems, LLC v. U.S. Tennis Ass'n, Inc.*, 350 F. Supp. 3d 143, 172 (E.D.N.Y. 2018); *see also* 18 U.S.C. § 1839(3). There can be no dispute here that the Future Inland Flood Data is First Street's trade secret under the DTSA and New York law.

First, First Street has spent millions of dollars to develop its flood risk data, including the Future Inland Flood Data, which was built on First Street's prior work and data.  (Eby Decl. ¶ 9.) No one outside of certain data scientists and software engineers at First Street and Fathom has the technical know-how and source material to develop the Future Inland Flood Data.  (*Id*. ¶ 14.) The Future Inland Flood Data therefore cannot be easily replicated or reverse engineered without tremendous expense and effort.  Although First Street does grant licenses to the Future Inland Flood Data for certain uses, First Street obligates any licensee to keep any data disclosed to the licensee strictly confidential and does not disclose the underlying software code used to generate the Future Inland Flood Data.  (*Id.* ¶ 9.)

Second, First Street has taken every possible measure to ensure that the Future Inland Flood Data remains secret. Under the Agreement, Fathom explicitly agreed that all Output Data developed under the Agreement, including the Future Inland Flood Data, would be considered First Street's Confidential Information. (*Id.* ¶ 16.) The Agreement also makes clear that Fathom was to take all necessary steps to protect First Street's Confidential Information, including the Future Inland Flood Data. For example, Fathom agreed that it would not disclose First Street's confidential data to any third party, unless explicitly agreed by the parties. (*Id.* ¶ 15.) Further, Fathom agreed to certain restrictions regarding its rights to resell the Future Inland Flood Data, including that Fathom would not license the Future Inland Flood Data to any First Street Competitor, and that, to the extent Fathom was permitted to license any of First Street's Confidential Information, Fathom was required to ensure that its counterparty kept First Street's data confidential and secret. (*Id.* ¶¶ 17-18.) First Street also requires that any entity with a license to use the Future Inland Flood Data agree to keep that data confidential under a written license agreement. (*Id.* ¶ 9.) Licensing its data subject to strict confidentiality provisions reinforces the confidentiality and secrecy of First Street's trade secrets, including the Future Inland Flood Data. *See Fabkom*, 1996 U.S. Dist. LEXIS 13686 at *20-*21 (holding that distribution of trade secret information to clients through a license agreement that requires confidentiality does not destroy the secrecy of a trade secret, but rather reinforces it) (citing *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 664 (4th Cir.), *cert. denied*, 510 U.S. 965, (1993); *Data General Corp. v. Grumman Sys. Support Corp.*, 825 F. Supp. 340, 359 (D. Mass. 1993), *remanded in part*, 36 F.3d 1147 (1st Cir. 1994); *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1334 (N.D. Ill. 1990)).

Third, First Street's Future Inland Flood Data is of tremendous value to competitors. The

Future Inland Flood Data is a one-of-kind dataset that produces hazard layers showing the likelihood and extent of flooding for any given property. (Eby Decl. ¶¶ 14, 25.) Any unauthorized user with access to First Street's Future Inland Flood Data would confer a competitive advantage that it otherwise would not have enjoyed. *See Anacomp, Inc. v. Shell Knob Servs.*, No. 93 Civ. 4003 (PKL), 1994 U.S. Dist. LEXIS 223, at *32 (S.D.N.Y. Jan. 7, 1994) ("In assessing the value of certain information, 'an aggrieved plaintiff need not show that the information it seeks to protect is vital to its business, but only that the information would provide the unauthorized user of it with an unfair competitive advantage which it would not otherwise have enjoyed.'"). And that is exactly what happened here. ClimateCheck has not developed its own proprietary flood data and instead relies on publicly available data to estimate flood risk. But ClimateCheck gained unauthorized access to First Street's Future Inland Flood Data, used that data in its software products, and then sold those products to at least two potential First Street customers. (Eby Decl. ¶35.) In addition, ClimateCheck is using First Street's Future Inland Flood Data to actively seek business from two of the largest potential customers for flood risk models. (*Id.* ¶ 44.)

**B.    Fathom's Unauthorized Disclosure of First Street's Trade Secrets and ClimateCheck's Use of Those Trade Secrets Constitutes Irreparable Harm.**

Because the Future Inland Flood Data is First Street's trade secret, Fathom's unauthorized, continuing disclosure—and ClimateCheck's continued unauthorized use—constitutes irreparable harm to First Street. Indeed, courts in this Circuit routinely find that the threatened dissemination or use of a plaintiffs' trade secrets constitute irreparable harm that cannot be measured in money damage. *See, e.g. FMC Corp. v. Taiwan Giant Indus. Co.*, 730 F.2d 61, 65 (2d Cir. 1984) ("the district court should issue the preliminary injunction" enjoining the defendants from "making use" of trade secrets because, *inter alia*, "the loss of trade secrets

cannot be measured in money damages. A trade secret once lost, is of course, lost forever.") (internal citations omitted). *See also Fabkom*, 1996 U.S. Dist. LEXIS 13686, at *14-*15 (plaintiff had satisfied the requirement to show irreparable harm when it alleged that a competitor had misappropriated its trade secrets and was continuing to exploit them by offering its software products that incorporated the trade secrets in the marketplace). And because the Future Inland Flood Data is highly technical and can only be used by a few "specialized" businesses, the presumption of irreparable harm granted to trade secrets is "particularly appropriate" here. *Secured Worldwide LLC*, 2015 U.S. Dist. LEXIS 44730, at * 28-29.

     **C.**    **First Street Will Suffer Ongoing Irreparable Harm if Fathom Continues to Disclose First Street's Trade Secrets.**

Fathom's refusal to cease disclosing First Street's Future Inland Flood Data to ClimateCheck is causing ongoing irreparable harm to First Street, which will continue absent the an order from this Court enjoining Fathom from doing so. *See IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011) (holding that that the threatened dissemination of trade secrets generally creates a presumption of irreparable harm and evidence that the defendant was disclosing plaintiff's trade secrets to a competitor was sufficient to satisfy the irreparable harm requirement for a preliminary injunction).

First Street has repeatedly told Fathom that it must immediately cease providing the Future Inland Flood Data to ClimateCheck. And Fathom has admitted that its disclosure of that data to ClimateCheck, First Street's direct competitor, is a breach of the Agreement. (Eby Decl. ¶ 28.) But Fathom has refused to immediately stop providing the Future Inland Flood Data to ClimateCheck. Instead, Fathom hid the breach for months and, after being confronted by First Street, claimed it will take four *more* months for ClimateCheck to "swap out" First Street's data in its systems. (*Id.* ¶ 41.) Compounding First Street's ongoing injury, Fathom granted a ***new***

purported license to ClimateCheck to use the Future Inland Flood Data during this four month "wind down period." (*Id.* ¶ 40.)

Fathom's wrongful disclosure of First Street's trade secrets alone is sufficient to show a likelihood of irreparable injury to First Street. *See IDG USA, LLC*, 416 F. App'x at 88; *see also Secured Worldwide LLC,* 2015 U.S. Dist. LEXIS 44730, at *28-*29. But the injury to First Street is even more acute because Fathom disclosed, and is continuing to disclose, First Street's trade secrets to First Street's direct competitor. Accordingly, First Street has sufficiently demonstrated that it will suffer an irreparable injury absent the entry of a temporary restraining order or preliminary injunction. *See Testing Servs., N.A.*, 443 F. Supp. 3d at 331 (finding "a likelihood of irreparable harm absent a preliminary injunction" where "defendants were disseminating [the plaintiff's] trade secrets to one of its competitors").

### D. First Street Will Suffer Ongoing Irreparable Harm if ClimateCheck Continues to Use First Street's Trade Secrets to Compete.

ClimateCheck is using First Street's confidential, proprietary, trade secret information to compete directly with First Street. (Eby Decl. ¶¶ 31, 37-39, 47.) ClimateCheck offers its climate-change risk rating services, including a flood risk rating that relies on the Future Inland Flood Data, directly to property owners and individual consumers (*Id.* ¶ 31, Compl. ¶ 8.) in direct competition with First Street. In addition, First Street is aware that ClimateCheck has entered into at least two contracts on the basis of First Street's Future Inland Flood Data. (Eby Decl. ¶ 31.) ClimateCheck's continued use of First Street's confidential and proprietary trade secrets will cause on-going, irreparable harm to First Street because it (1) threatens First Street's ability to enter into new deals of its own by weakening First Street's position as a market leader and innovator; (2) improperly allows ClimateCheck to try to win business away from First Street when First Street and ClimateCheck are actively seeking business from the two largest potential

customers of flood risk models; and (3) erodes the value of First Street's confidential data, which depends in part on the fact that it is only available for use and exploitation by First Street, and only First Street may authorize its use by others. (*Id.* ¶ 47.)

In short, ClimateCheck's actions jeopardize a key source of revenue and funding for First Street's non-profit work and create a serious risk of irreparable harm unless enjoined by this Court. *See Anacomp, Inc.*, 1994 U.S. Dist. LEXIS 223, at *15 (granting motion for a preliminary injunction enjoining the use of plaintiff's proprietary and finding it likely that plaintiff would suffer irreparable harm when plaintiff demonstrated that the defendants were using the proprietary materials to compete directly with plaintiff); *see also Fabkom*, 1996 U.S. Dist. LEXIS 13686, at *16 (plaintiff was likely to suffer irreparable harm because competitor's use of its trade secrets threatened plaintiff's position in the market).

## II.     FIRST STREET IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

Because Fathom has admitted that it breached the Agreement by providing First Street's Future Inland Flood Data to First Street's direct competitor, ClimateCheck, and because ClimateCheck has used and is continuing to knowingly use First Street's confidential, proprietary data without authorization, First Street is likely to succeed on the merits of its claims.

### A.     Fathom Admittedly Disclosed First Street's Proprietary, Confidential Future Inland Flood Data in Violation of the Agreement.

Fathom has already admitted that it breached the parties' Agreement by disclosing First Street's confidential, proprietary data to ClimateCheck. Indeed, Fathom even put that admission in writing, stating it "agreed in the Agreement not to sell, license, supply, distribute or otherwise make available certain models to any 'First Street Competitor'" and it "inadvertently licensed a small amount of data to a potential First Street Competitor." (Eby Decl. ¶ 28.) That admission alone demonstrates First Street's likelihood of success on its breach of contract claim. *See*

*Tycoons Worldwide Grp. (Thai.) Pub. Co., Ltd. v. JBL Supply Inc.*, 721 F. Supp. 2d 194, 203-04 (S.D.N.Y. 2010) (granting the plaintiff's motion for summary judgment on its breach of contract claim because, *inter alia*, the defendant "admitted that it breached the Agreements."); *see also Ayco Co., L.P. v. Frisch*, 795 F. Supp. 2d 193, 208 (N.D.N.Y. 2011) (holding that because, *inter alia*, "the Defendants do not appear to deny that" the elements for breach of contract are met, the "Plaintiff . . . demonstrated a likelihood of success on its breach of contract claim.").  Even without Fathom's admission, however, First Street will prevail on its breach of contract claim because there is no dispute that Fathom disclosed First Street's confidential, proprietary Future Inland Flood Data to ClimateCheck in violation of the Agreement.  *See Anacomp*, 1994 U.S. Dist. LEXIS 223, at *47-48 (plaintiff showed a likelihood of success on the merits of its breach of contract claim when defendant had a contractual duty not to disclose the proprietary materials and plaintiff brought forth evidence that defendant had improperly disclosed the materials to a third party); *see also FMC Corp.* 730 F.2d at 65 (". . . a trade secret once lost is, of course, lost forever.").  First Street has more than sufficiently alleged a prima facie case for breach of contract.  *See Richardson Greenshields Sec., Inc. v. Mui-Hin Lau*, 651 F. Supp. 929, 932 (S.D.N.Y. 1986) (grant preliminary injunction, because, *inter alia*, the plaintiff "demonstrated a prima facie case for breach of its . . . agreements with defendants.").

**B.      There Can Be No Dispute That Climate Check Misappropriated First Street's Trade Secrets—the Future Inland Flood Data.**

In order to prevail on its claim for misappropriation of trade secrets under the DTSA and New York law against ClimateCheck, First Street "must demonstrate (i) that it possessed a trade secret and (ii) that the defendant used that trade secret in breach of an agreement, a confidential relationship, or duty, or as a result of discovery by improper means."  *Fabkom*, 1996 U.S. Dist. LEXIS 13686, at *16 (quoting *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1176

(2d Cir. 1993)); *see also Kraus USA, Inc. v. Magarik*, No. 17-CV-6541 (ER), 2020 U.S. Dist. LEXIS 83481, at *14 (S.D.N.Y. May 12, 2020) ("The elements for stating a claim of misappropriation of trade secrets under New York law 'are fundamentally the same' as those sustaining a claim under the DTSA.")  First Street easily satisfies both elements here.

As demonstrated above, there can be no dispute that the Future Inland Flood Data is First Street's trade secret.  *See supra* Section I.A.  Nor can there be any dispute that ClimateCheck has used and is continuing to use First Street's trade secret even though ClimateCheck was put on notice that Fathom licensed the Future Inland Flood Data to ClimateCheck in breach of the Agreement.  (Eby Decl. ¶¶ 40, 44.)  Accordingly, First Street likely will prevail on the second element of its misappropriation of trade secrets claim as well by showing that ClimateCheck has actual knowledge that its receipt of the Future Inland Flood Data was due solely to Fathom's breach of its contract with First Street.  *See Fabkom*, 1996 U.S. Dist. LEXIS 13686, at *34 (citing *Computer Assoc. Int'l Inc. v. Altai, Inc.*, 982 F.2d 693, 718 (2d Cir. 1992)) ("A misappropriation of trade secrets claim may be based on the breach of an agreement by a third party where the party receiving and using the trade secret knows or has reason to know that its receipt of the information breaches the third party's duty"); *see also Testing Servs., N.A.* 443 F. Supp. 3d at 342 (a DTSA plaintiff "succeeds on a DTSA misappropriation claim if she shows that the trade secret was: (A) acquired by someone who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosed by another without express or implied consent.")  Further, "[i]t is irrelevant whether the breach is committed" by Fathom: "all that is required is that the defendant know or have reason to know of the breach and still continue to use the trade secret."  *Fabkom*, 1996 U.S. Dist. LEXIS 13686, at *34.

## III. THE REQUESTED INJUNCTION IS IN THE PUBLIC INTEREST AND THE BALANCE OF THE EQUITIES TIP IN FAVOR OF FIRST STREET.

Granting injunctive relief is in the public interest because it would protect First Street's trade secrets and legitimate interest in maintaining the value of its business relationships and its intellectual property. *See Testing Servs. N.A.*, 443 F. Supp. 3d at 347 (finding the public interest served because the injunction would protect plaintiff's legitimate interests in maintaining the value and secrecy of its trade secrets and the value of its business relationships). In addition, enforcing Fathom's confidentiality obligations to First Street, and the freely bargained for restrictions on Fathom's licensing or sale of First Street's Trade Secret Information, including the Inland Flood Data, is in the public interest. *Id.* ("injunctive relief would serve the public interest by ensuring that reasonable restrictive covenants into which the parties voluntarily entered are enforced"). And the public interest is also served because First Street is a nonprofit with a mission to develop the most accurate flood risk models on the market for both consumers and academics. Fathom's improper disclosure of First Street's trade secrets, and ClimateCheck's use of those trade secrets solely for profit, threatens First Street's ability to benefit from its own intellectual property—developed at a significant cost—and to fund its non-profit mission.

Finally, the balance of the equities clearly is in First Street's favor. If the injunction is not granted, the value of First Street's trade secrets will be irrevocably eroded if confidentiality is breached. *Testing Servs. N.A.*, 443 F. Supp. 3d at 346 (loss of confidentiality of trade secrets supports finding that balance of the equities tip in trade secret owner's favor).

## IV. BOND IS UNNECESSARY BECAUSE THE LIKELIHOOD OF SUCCESS ON THE MERITS IS OVERWHELMING.

The Court should exercise its discretion to deny a bond given that "the likelihood of success on the merits is overwhelming. . . ." *See Lighting & Supplies, Inc. v. Sunlite USA Corp.*, 14-CV-4344, 2015 U.S. Dist. LEXIS 78571, at *4 (E.D.N.Y. June 16, 2015) (quoting *Doctor's*

*Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996)) (Courts have "'wide discretion' to determine whether a bond is appropriate" when issuing a preliminary injunction or temporary restraining order); *see also* Fed. R. Civ. P. 65(c).

On its breach of contract claim against Fathom, the likelihood of success is "overwhelming" because Fathom has admitted that it breached the Agreement. (Eby Decl. ¶ 40); *Lighting & Supplies*, 2015 U.S. Dist. LEXIS 78571, at *2-*4 (declining to require bond where injunction was based on the parties' concession that plaintiffs' rights were violated). The likelihood of success on First Street's DTSA claim and misappropriation of trade secrets claim against ClimateCheck is "overwhelming" given that there is no dispute that ClimateCheck has used and is continuing to use First Street's Future Inland Flood Model without authorization and has obtained business as a result. *See Paz Sys. v. Dakota Grp. Corp.*, 514 F. Supp. 2d 402, 408-409 (E.D.N.Y. 2007) (finding liability where defendant wrongfully took, retained, and used a plaintiff's trade secrets and there was no dispute that the defendant obtained business as result of its access to plaintiff's trade secrets); *see also Shamrock Power, LLC v. Scherer,* No. 12 Civ. 8959 (KMK)(JCM), 2016 U.S. Dist. LEXIS 170901, at *36 (S.D.N.Y. Dec. 7, 2016).[2]

## CONCLUSION

For the reasons set forth above, First Street respectfully asks that the Court enter an order granting the relief that First Street has requested in its Order to Show Cause.

---

[2] Moreover, ClimateCheck's and Fathom's "probability of harm [absent the posting of a bond] . . . is negligible." *Lighting & Supplies*, 2015 U.S. Dist. LEXIS 78571, at *5. Fathom will not be harmed because it has no right to license First Street's Future Inland Flood Data and ClimateCheck will not be harmed because it did not have—and still does not have—a right to use any of First Street's data. *DeWitt Stern Group, Inc. v. Eisenberg*, No. 13 Civ. 3060, 2013 U.S. Dist. LEXIS 78598, at *16 (S.D.N.Y. June 3, 2013) (because the defendant was not "likely to suffer any harm absent the posting of a bond . . . the bond requirement is unnecessary.")

Dated: March 15, 2021
New York, New York

Respectfully submitted,

 _/s/Jamie A. Levitt_
Jamie A. Levitt
Adam J. Hunt
Janie C. Buckley
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
Email: jlevitt@mofo.com
adamhunt@mofo.com
jbuckley@mofo.com

*Attorneys for First Street
Foundation*

ny-2076927